UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jason Carlson,                                        Case No. 19-cv-1232 (WMW/HB)

                           Plaintiff,

                                                      **ORDER**

            v.

BNSF Railway Company,

                           Defendant.

---

In this action arising from alleged whistleblower retaliation and workplace injuries, Defendant BNSF Railway Company (BNSF) moves for summary judgment as to each of Plaintiff Jason Carlson's three claims to relief. (Dkt. 151.) In addition, BNSF moves to exclude the opinions and testimony of Carlson's engineering expert and to bifurcate Carlson's claims for trial. (Dkts. 134, 145.) For the reasons addressed below, BNSF's motion for summary judgment is granted in part and denied in part, BNSF's motion to exclude expert testimony is denied, and BNSF's motion to bifurcate is denied as moot.

## BACKGROUND

BNSF is a Delaware corporation that operates a freight railroad carrier in Minnesota and throughout the United States. Carlson is a Minnesota resident and a former employee of BNSF who worked as a conductor beginning in April 2006 until BNSF terminated his employment in November 2017.

On August 11, 2017, Carlson worked as the conductor on a westbound train between Northtown and Dilworth, Minnesota. Carlson subsequently reported to BNSF, both orally and in writing, that he sustained injuries during this trip when the train traveled over rough tracks at two locations: the control point at mile post 210.7 (CP Diamond) and the Hawley detector at mile post 240.5 (Hawley Detector). BNSF became skeptical of Carlson's reported injuries because of inconsistencies in the information Carlson provided to BNSF. According to Carlson, BNSF employees, including terminal manager Herbert Beam, acted dismissively about Carlson's alleged injury and discouraged Carlson from filing a personal-injury claim.

A collective bargaining agreement (CBA) between BNSF and the United Transportation Union defines the procedures that BNSF must follow before disciplining an employee. Pursuant to the CBA, BNSF commenced a disciplinary investigation to determine whether Carlson had falsely reported a personal injury. BNSF issued an investigation notice on August 28, 2017, and an investigation hearing occurred on October 24, 2017. Prior to the hearing, BNSF collected and reviewed witness statements and other evidence, including video footage from the August 11, 2017 trip during which Carlson's injury allegedly occurred. Four witnesses testified at the October 24, 2017 hearing: Carlson; terminal manager Beam; engineer Timothy Olson, who worked aboard the train with Carlson on the date of the alleged injury; and road foreman of engines Chadd Nelson, who retrieved and analyzed the relevant video footage. Beam and Nelson testified, respectively, that the video footage "portrayed a very smooth ride" and did not

depict any "movements inside the cab that would relate to being moved about as specified in [Carlson's] statement." Beam also testified that, shortly after Carlson's alleged injury, Carlson told Beam that he was not sure where or how he sustained his injury and did not know "if it happened at work." Beam testified that BNSF employee Jason Randash sent someone to inspect the tracks after the alleged injury occurred, and Randash subsequently reported no track defects. In addition, in a written statement dated five days after the alleged injury, Olson reported that he did not notice any rough track at CP Diamond or the Hawley Detector. Consistent with his written statement, Olson testified at the October 24, 2017 hearing that he did not recall any unusual conditions during the August 11, 2017 trip or any rough track at either CP Diamond or the Hawley Detector.

Based on the record developed during the forgoing investigation, BNSF found that Carlson had been dishonest and falsely reported a personal injury on August 11, 2017, in violation of Rule 1.6 of BNSF's General Code of Operating Rules (GCOR). BNSF subsequently terminated Carlson's employment on November 2, 2017.[1] As an alternative basis for Carlson's termination, BNSF found that Carlson's conduct in August 2017 was Carlson's second serious rule violation within a 36-month period.[2]

---

[1]     Under BNSF's discipline policy, dishonesty—including "falsification or misrepresentation of an injury"—is a stand-alone violation that can warrant termination.

[2]     Under BNSF's policies, two or more "Serious" or "Level S" violations during a 36-month period are a basis for terminating employment. On July 21, 2016, Carlson received a 36-month suspension for a Level S violation, namely, failing to perform a required air brake test on July 8, 2016.

Carlson appealed his termination to a three-member Public Law Board (PLB). The PLB concluded that there was "no evidence in the record to support [Carlson's] testimony that the track was in such a state that he would be thrown 'from side to side' as he testified," and that BNSF "produced substantial evidence, including the engineer's testimony, that supports the discipline imposed," which was "neither excessive nor unreasonable."

Carlson commenced this action in May 2019, advancing three claims to relief. Count I alleges that, in violation of the Federal Rail Safety Act, 49 U.S.C. § 20109, BNSF terminated Carlson's employment in retaliation for Carlson engaging in protected activity—namely, reporting unsafe working conditions.  Count II alleges that BNSF's negligence caused the injuries Carlson sustained in August 2017 and, therefore, BNSF is liable for Carlson's injuries under the Federal Employers' Liability Act, 49 U.S.C. §§ 51 *et seq*.  Count III alleges that BNSF used a locomotive that was not in safe operating condition, in violation of the Locomotive Inspection Act, 49 U.S.C. § 20701.  BNSF moves for summary judgment as to each of Carlson's claims.  BNSF also moves to exclude the opinions and testimony of Carlson's engineering expert and to bifurcate Carlson's claims for purposes of trial.

## ANALYSIS

### I.      BNSF's Motion for Summary Judgment

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).  When asserting that a fact is genuinely disputed, the nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A).  A nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted). BNSF moves for summary judgment as to each of Carlson's three claims, which the Court addresses in turn.

### A.    Carlson's Federal Rail Safety Act Claim (Count I)

BNSF argues that it is entitled to summary judgment as to Carlson's Federal Rail Safety Act (FRSA) claim because there is no evidence that Carlson's engagement in protected activity was a contributing factor in BNSF's decision to terminate Carlson's employment.

Under the FRSA, a rail carrier "may not discharge . . . or in any other way discriminate" against an employee because the employee lawfully and in good faith reported conduct that the employee reasonably believed violated a federal law governing railroad safety or "report[ed], in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(a)(1), (b)(1)(A). To prevail on an FRSA claim, a plaintiff must establish a prima facie case by demonstrating that (1) the plaintiff engaged in a protected activity, (2) the defendant knew or suspected that the plaintiff had engaged in the protected activity, (3) the plaintiff suffered an adverse action, and (4) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action. *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). If a plaintiff makes this showing, the burden shifts to the defendant to prove, by clear-and-convincing evidence, that it would have taken the same adverse action against the employee even if the employee had not engaged in a protected activity. *Id.* Here, BNSF argues that Carlson cannot prove the fourth element of his FRSA claim—namely, that Carlson's protected activities were a contributing factor in BNSF's decision to terminate his employment.

A "contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* at 791 (internal quotation marks omitted). To prevail on an FRSA claim, the "contributing factor that an employee must prove is *intentional retaliation* prompted by the employee engaging in protected activity." *Neylon v. BNSF Ry. Co.*, 968 F.3d 724, 728 (8th Cir. 2020) (internal quotation marks omitted). A plaintiff must prove that engaging in the protected activity

6

"not only was a 'but for' cause of [the] injury, but was the proximate cause as well." *BNSF Ry. Co. v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 867 F.3d 942, 946 n.2 (8th Cir. 2017) (internal quotation marks omitted).  If an employee is disciplined for misconduct, the fact that the misconduct occurred in connection with a protected activity—such as filing an injury report—does not, without more, establish the contributing-factor element of an FRSA claim.  *Dakota, Minn. & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 948 F.3d 940, 946 (8th Cir. 2020) (observing that it "is well settled that employees cannot immunize themselves against wrongdoing by disclosing [the wrongdoing] in a protected-activity report" (internal quotation marks omitted)).

It is undisputed that the record lacks any *direct* evidence that Carlson's protected activities contributed to BNSF's decision to terminate Carlson's employment.  Carlson relies exclusively on circumstantial evidence instead.  When determining whether the circumstances raise an inference of retaliatory motive, courts may consider circumstantial evidence, including:

> the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge.

*Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 858 (8th Cir. 2018) (internal quotation marks omitted).  Carlson contends that the record contains circumstantial evidence that dishonesty was a pretextual reason for his termination, and retaliatory motive was the true reason for his termination.  In support of his pretext argument, Carlson relies on the

timing of his termination and asserts that BNSF had shifting explanations for its decision to terminate him, inconsistently applied its policies, and demonstrated antagonism and hostility toward Carlson's protected activities.   The Court addresses each aspect of Carlson's circumstantial evidence in turn.

### 1.   Temporal Proximity

Carlson first contends that the temporal proximity between the filing of his personal-injury report on August 11, 2017, and his termination in November 2017 supports an inference of retaliatory motive.  It is true that temporal proximity between a protected activity and an adverse action can, together with other evidence, support an inference of retaliatory motive.  *Id.*  But "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."  *Kuduk*, 768 F.3d at 792 (internal quotation marks omitted). To survive summary judgment, Carlson must identify additional circumstantial evidence of retaliatory motive.

### 2.   Shifting Explanations

Carlson next contends that BNSF had "shifting explanations" for its termination decision, thereby supporting a reasonable inference that Carlson's termination for dishonesty was a pretext for BNSF's retaliatory motive.

In support of this argument, Carlson relies on an August 22, 2017 email exchange in which BNSF managers discussed multiple possible rule violations for which to investigate Carlson.  In this email exchange, BNSF managers contemplate whether, based

on the evidence before them, they should investigate Carlson either for failing to report rough track or for falsifying a personal-injury report.  In doing so, one BNSF manager opined that "[g]oing after [Carlson for] failure to report a rough track would not hold up in an investigation or with an arbitrator because we don't issue [an] investigation for all non-reported rough track incidents."

Notably, this email exchange occurred before an investigation had begun, when BNSF had an incomplete understanding of what had occurred and was determining whether and on what grounds to investigate its suspicions that Carlson had lied.  When this email exchange occurred, BNSF had evidence suggesting that Carlson had been dishonest on August 11, 2017, when he reported an injury and rough track, including inconsistencies between Carlson's written and verbal statements and inconsistencies between Carlson's statements and the statements of other BNSF employees.  This email exchange cannot reasonably demonstrate that BNSF had "shifting explanations" for terminating Carlson because the email exchange occurred more than two months *before* BNSF decided to terminate Carlson.  As such, this evidence does not support a reasonable inference that dishonesty was a mere pretext for Carlson's termination. Instead, this evidence suggests that BNSF suspected that Carlson had been dishonest and contemplated whether Carlson's conduct violated any BNSF rules that could warrant further investigation.[3]  BNSF did not reach a disciplinary decision, let alone provide a

---

[3]   The fact that BNSF managers declined to pursue a possible rule violation that "would not hold up in an investigation," and instead investigated a different rule violation, does not reasonably suggest that BNSF's subsequent termination of Carlson

basis for that decision, until after the investigation had concluded more than two months later. At that point, BNSF did not shift its explanation for Carlson's termination. Instead, the record demonstrates that BNSF consistently based Carlson's termination on his dishonesty when reporting a personal injury.

Because there is no evidence that BNSF had "shifting explanations" for Carlson's termination, a jury could not reasonably infer on this basis that BNSF's termination of Carlson for dishonesty was a pretext for a retaliatory motive.

### 3.      Inconsistent Application of Policies

Carlson next contends that BNSF inconsistently applied its policies, thereby supporting a reasonable inference that Carlson's termination for dishonesty was a pretext for BNSF's retaliatory motive.

In support of this argument, Carlson first cites a BNSF policy providing that "an employee will not be disciplined for reporting a muscular-skeletal injury after the prescribed time period" in certain circumstances. Carlson also contends that other employees have been charged with failing to report track defects without being terminated. But the undisputed evidence demonstrates that Carlson was not terminated for the untimely reporting of a muscular-skeletal injury or for failing to report track defects. Rather, BNSF terminated Carlson for dishonesty and falsely reporting a personal injury, in violation of GCOR 1.6. As such, the application of BNSF's policies pertaining

---

was a mere pretext for a retaliatory motive. Rather, this fact suggests that BNSF chose not to pursue a futile line of investigation and instead chose to pursue a more reasonable line of investigation.

to untimely reports of muscular-skeletal injuries and failing to report track defects is irrelevant.

Carlson also contends that BNSF investigated violations of GCOR 1.6 in 162 instances between 2015 and 2019, and only 14 of those investigations resulted in an employee's termination. But as Carlson concedes, only 7 of those 162 investigations explicitly involved "dishonesty." And Carlson does not present any evidence demonstrating how the circumstances of his termination compare to any of the other 162 investigations that involved violations of GCOR 1.6. Indeed, the record lacks sufficient details about the other 162 investigations from which meaningful comparisons can be made. As such, this evidence does not support a reasonable inference that BNSF has inconsistently applied GCOR 1.6 or that BNSF relied on GCOR 1.6 in this case as a pretext for Carlson's termination.

Because there is insufficient evidence that BNSF inconsistently applied its policies, a jury could not reasonably infer from this evidence that BNSF's termination of Carlson for dishonesty was a pretext for a retaliatory motive.

### 4.    Antagonism or Hostility

Carlson contends that BNSF's antagonism and hostility toward his filing of a personal-injury report supports a reasonable inference that Carlson's termination for dishonesty was a pretext for BNSF's retaliatory motive.

"[N]ot every prejudiced remark made at work supports an inference of illegal employment discrimination." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d

616, 619 (8th Cir. 1998). Discriminatory hostility in the decision-making process or by individuals closely involved in that process are distinct from stray remarks in the workplace, statements by non-decisionmakers or statements by decisionmakers unrelated to the decision-making process. *Id.* Carlson must demonstrate that the individuals who decided to terminate him showed discriminatory animus, *not* that other employees showed discriminatory animus. *Gunderson v. BNSF Ry. Co.*, 14-CV-0223 PJS/HB, 2015 WL 4545390, at *14–*15 (D. Minn. July 28, 2015), *aff'd*, 850 F.3d 962 (8th Cir. 2017).

Carlson relies on his testimony that his coworker, Shawn Koppelman, waited three hours to take Carlson to the hospital after Carlson reported his injury. Carlson also relies on his testimony that terminal manager Beam acted dismissively about Carlson's alleged injury and discouraged Carlson from filing a personal-injury claim. But because there is no evidence that Koppelman or Beam were involved in the decision to terminate Carlson's employment, antagonism and hostility from Koppelman and Beam is irrelevant.[4]

Carlson also suggests that other alleged decisionmakers—namely, several BNSF supervisors—acted with hostility in August 2017 when they discussed whether to investigate Carlson for violating BNSF's rules. Specifically, in the August 2017 email exchange addressed above in Part I.A.2. of this Order, one BNSF supervisor questioned

---

[4]    At oral argument, when the Court asked Carlson's counsel to identify who made the decision to terminate Carlson's employment, counsel indicated that they do not know. But to survive summary judgment, Carlson must identify specific evidence that supports his argument. *See* Fed. R. Civ. P. 56(c)(1)(A). Although Carlson's counsel suggested that Beam *might* have been a decisionmaker, Carlson offers no evidence from which a jury reasonably could reach the conclusion that Beam was a decisionmaker.

whether BNSF should "take a run at" Carlson or "go after" Carlson for possible rule violations.  When viewed in context, however, this email clearly reflects stray remarks about whether to commence an investigation into whether Carlson violated BNSF's rules by lying.  This email does *not* reflect expressions of animus toward Carlson for filing a personal-injury report, nor does the email directly relate to the decision to terminate Carlson's employment, which did not occur until more than two months later.  As such, this evidence does not support a reasonable inference of illegal employment discrimination.  *See Rivers-Frison*, 133 F.3d at 619.

Because there is insufficient evidence that BNSF decisionmakers acted with antagonism or hostility toward Carlson for filing a personal-injury report, a jury could not reasonably infer from this evidence that BNSF's termination of Carlson for dishonesty was a pretext for a retaliatory motive.

In summary, Carlson has not presented circumstantial evidence from which a jury reasonably could find that BNSF's decision to terminate Carlson's employment was intentional retaliation prompted by Carlson engaging in a protected activity.  Because there is no genuine dispute of material fact and the evidence fails to prove this essential element of Carlson's FRSA claim, BNSF's motion for summary judgment is granted as to Carlson's FRSA claim (Count I).

**B.     Carlson's Federal Employers' Liability Act Claim (Count II)**

BNSF argues that it is entitled to summary judgment as to part of Carlson's Federal Employers' Liability Act (FELA) claim.[5]  Specifically, BNSF contends that Carlson lacks any evidence that he encountered "rough track" at the Hawley Detector location during his August 11, 2017 trip.

FELA provides railroad employees with a cause of action for their injuries and provides, in relevant part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its . . . track . . . or other equipment.

45 U.S.C. § 51.  "FELA imposes upon employers a continuous duty to provide a reasonably safe place to work."  *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 983 (8th Cir. 2020).  Under FELA, a railroad is liable if its "negligence played any part, *even the slightest*, in producing the employee's injury."  *Id.* (internal quotation marks omitted).  However, the "basis of liability remains negligence, not the fact that injuries occur."  *Id.* (internal quotation marks omitted).

BNSF contends that Carlson cannot prove that the train tracks at the Hawley Detector location were defective or unsafe because Carlson lacks expert testimony as to this issue.  But BNSF identifies no legal authority *requiring* expert testimony as to this

---

[5]     A party may move for summary judgment as to any "claim or defense" or as to any "*part* of [a] claim or defense."  Fed. R. Civ. P. 56(a) (emphasis added).

issue, and courts repeatedly have reached the opposite conclusion. *See Lynch v. Ne. Regional Commuter R.R. Corp.*, 700 F.3d 906, 915 (7th Cir. 2012) (recognizing that expert testimony is "not essential under . . . FELA" and that a "long line of FELA cases reiterate the lesson that [FELA] vests the jury with broad discretion to engage in common sense inferences regarding issues of causation and fault" (internal quotation marks omitted)).  It is true that expert testimony in FELA cases may be "required to establish the causal connection between the accident and some item of physical or mental injury unless the connection is a kind that would be obvious to laymen." *Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010) (internal quotation marks omitted).  But *Brooks* is inapposite. *Brooks* involved a back injury that "had no obvious origin" and the plaintiff "did not point to a specific incident that injured him." *Id.*  Here, by contrast, Carlson alleges and presents evidence that he was "slapped" or "jolted" from side to side when the train encountered rough tracks.  This is not a case in which the plaintiff's alleged injuries have no obvious origin and require expert testimony as to causation.

Indeed, to prevail on a FELA claim, a plaintiff may rely on circumstantial evidence to prove that the railroad's negligence played a part in causing the plaintiff's injuries:

> The employer is stripped of his common-law defenses [under FELA] and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.  The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even

> though entirely circumstantial, from which the jury may with
> reason make that inference.

*Ackley v. Chi. & N. W. Transp. Co.*, 820 F.2d 263, 266 (8th Cir. 1987) (quoting *Rogers v. Mo. Pac. R.R.*, 352 U.S. 500 (1956)).   Here, Carlson's testimony and his contemporaneous reports to BNSF reflect that he experienced rough track and was "slapped side to side" at the Hawley Detector location.   Another BNSF employee, Tim Olson, testified that he did not recall experiencing rough track at the Hawley Detector on August 11, 2017, but that in the past he has experienced a side-to-side motion at the Hawley Detector location "because of the tracks."   Although a jury might choose to disbelieve this testimony, give it minimal weight, or draw alternative inferences from it, this testimony nonetheless provides sufficient circumstantial evidence from which a jury reasonably *could* find that BNSF negligently maintained the tracks at the Hawley Detector location and that BNSF's negligence played a part in causing Carlson's injuries.

For these reasons, BNSF's motion for summary judgment is denied as to Carlson's FELA claim (Count II).

### C.   Carlson's Locomotive Inspection Act Claim (Count III)

BNSF argues that it is entitled to summary judgment as to Carlson's Locomotive Inspection Act (LIA) claim.

"The LIA has the 'purpose and effect of facilitating employee recover[y]' by conferring on railroads a 'duty to provide safe equipment.' "  *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018) (quoting *Urie v. Thompson*, 337 U.S. 163, 188–89 (1949)).   Significantly, "[a]n injured employee does not have a private right of action

under the LIA." *Id.* (citing *Urie*, 337 U.S. at 188–89); *accord Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 886 n.1 (8th Cir. 2012) (observing that, "because the LIA does not provide an independent cause of action for personal injuries, the district court granted summary judgment for BNSF" as to this claim). But proof that a railroad violated the LIA can demonstrate liability under FELA because "violating LIA regulations would constitute negligence per se" under FELA. *Cowden*, 690 F.3d at 886 n.1; *accord Miller*, 972 F.3d at 984 (observing that "a railroad's violation of a safety statute . . . is negligence per se" (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 n.12 (2011)). As such, Count III of Carlson's complaint is properly construed, not as a separate cause of action, but instead as a theory of liability as to Carlson's Count II FELA claim.

"Under FELA, an employer's 'fault may consist of a breach of the duty of care . . . or of a breach of some statutory duty.' " *Miller*, 972 F.3d at 984 (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958)). The LIA is one such statutory duty, which provides that a railroad may not "use or allow to be used a locomotive . . . on its railroad line" unless the locomotive "and its parts and appurtenances" are "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1).

BNSF again argues that expert testimony is required to prove causation and fault in a FELA case. This argument is unavailing for the reasons addressed above in Part I.B. of this Order. *See Lynch*, 700 F.3d at 915 (recognizing that expert testimony is "not essential under . . . FELA" and that a jury may rely on "common sense inferences

regarding issues of causation and fault"); *Brooks*, 620 F.3d at 899 (recognizing that expert testimony is not necessary if the causal connection "would be obvious to laymen"). Here, as addressed above, Carlson presents evidence that he was "slapped" or "jolted" from side to side when the train in which he was working encountered rough tracks. In addition, Carlson presents evidence that the train had four traction motors instead of six and shocks that were "skinnier than when they came from the factory." From this evidence, a jury reasonably could infer that BNSF used a locomotive that was not "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). As such, a genuine dispute of material fact exists as to this issue.

For these reasons, BNSF's motion for summary judgment is denied as to Carlson's LIA claim (Count III).

## II.    BNSF's Motion to Exclude Expert Opinions and Testimony

BNSF moves to exclude the opinions and testimony of Carlson's expert witness, Brian Hansen. Carlson retained Hansen to provide opinions about BNSF's inspection and maintenance practices at the locations where Carlson's injuries allegedly occurred— namely, CP Diamond and the Hawley Detector. Hansen opines that BNSF failed to maintain appropriate track geometry, failed to adequately inspect the track, and failed to correct track defects that caused rough riding conditions. BNSF argues that Hansen's opinions and testimony are unreliable and, therefore, must be excluded.

The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion.  *Id*. (internal quotation marks omitted).  Determinations as to the admissibility of expert testimony are within a district

court's discretion.  *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.   When making this reliability determination, a court may evaluate whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance.  *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94).   These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case.  *Id.*   A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case."  *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted).   When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge."  *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no

assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted).   But disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony.  *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544.

BNSF does not specifically challenge Hansen's qualifications.   Indeed, Hansen is a railway engineering consultant with more than 20 years of experience working for a railroad in various roles.   Rather than challenging Hansen's qualifications, BNSF challenges the reliability of Hansen's opinions.   Specifically, BNSF contends that Hansen (1) fails to define or describe the overall methodology he used to formulate his opinions, (2) offers opinions about the track conditions at the Hawley Detector location that are speculative, and (3) offers opinions about the track conditions at CP Diamond that ignore relevant facts.   The Court addresses each argument in turn.

### A.     Overall Methodology

BNSF argues that Hansen's opinions are unreliable because he fails to define or describe the precise methodology that he used to formulate his opinions.

Although expert testimony must be based on "reliable principles and methods," a district court's reliability determination " 'may focus upon personal knowledge or experience' rather than scientific foundations."  *United States v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *accord United States v. McDaniel*, 925 F.3d 381, 385 (8th Cir. 2019) (observing that expert testimony need not be based on a particular scientific methodology to be

admissible).   A qualified expert's "observations coupled with expertise generally may form the basis of an admissible expert opinion."   *Shuck v. CNH Am., LLC*, 498 F.3d 868, 875 (8th Cir. 2007) (affirming admissibility of expert testimony when the experts "observed the relevant evidence, applied their specialized knowledge, and systematically included and excluded possible theories of causation").   A challenge to an expert's methodology is "particularly misplaced" when the expert "based his opinion on observations rather than tests."   *Id.* at 874.

Here, the record reflects that Hansen reviewed numerous materials, including but not limited to reports about Carlson's injuries, BNSF's defect and inspection reports, BNSF's maintenance rules, and railroad industry manuals and standards.   Hansen also drew upon his specialized knowledge, training, and decades of experience with railway engineering, including the construction, maintenance, and inspection of railroad tracks. In short, Hansen reviewed the relevant evidence, applied his specialized knowledge and experience, and reached conclusions about whether BNSF adequately inspected and maintained railroad track conditions so as to provide safe train operation and ride quality at the time of Carlson's injuries.   Hansen's observations coupled with his expertise are sufficient to form the basis of an admissible expert opinion.   *See, e.g.*, *id.* at 874–75.   Any criticism about Hansen's observations is "more properly directed to the jury and to the weight to be accorded [Hansen's] opinions rather than to the question of admissibility." *Id.* at 875.

Accordingly, BNSF's motion to exclude Hansen's opinions and testimony on this basis is denied.

### B.      Hawley Detector Opinions

BNSF next argues that Hansen's opinions about defects near the Hawley Detector are unreliable because they are speculative and unsupported by sufficient facts.

In his expert report, Hansen observes that BNSF's defect testing between August 2012 and August 2017 "repeatedly found wide gage (poor tie condition) between milepost 238 and 241"[6] and that "[n]umerous track geometry defects were found in the same locations repeatedly on separate testing dates." Hansen also observes that poorly maintained "track geometry," including gage and alignment, can cause poor ride quality. And Hansen concludes, based on his review of Carlson's injury report and other relevant materials, that these track geometry defects reflect that BNSF "failed to provide Mr. Carlson reasonably safe track conditions while traversing the railroad crossing/interlocking near . . . the Hawley detector . . . on August 11, 2017." Although BNSF characterizes these opinions as speculative, the record reflects that Hansen reached these opinions by observing the relevant evidence and applying his specialized knowledge and experience to his observations. BNSF appears to take issue with the strength and credibility of the facts underlying Hansen's opinions about defects near the Hawley Detector. But disputes about the factual basis of an expert's testimony implicate credibility, not admissibility. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*,

---

[6]      The Hawley Detector is at milepost 240.5.

472 F.3d at 544.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Accordingly, BNSF's motion to exclude Hansen's opinions and testimony on this basis is denied.

### C.     CP Diamond Opinions

BNSF next argues that Hansen's opinions about defects at the CP Diamond location are unreliable because Hansen relies on Carlson's account of what occurred but disregards relevant facts to the contrary.

Generally, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (internal quotation marks omitted).  But "it also is true that if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded."  *Id.*  An expert opinion is fundamentally unsupported if it "fails to consider the relevant facts of the case."  *Id.*

BNSF contends that Hansen disregarded the fact that the track at the CP Diamond location was resurfaced two days before Carlson's alleged injuries occurred, thereby remedying any track defects that previously existed.  But the record reflects that Hansen considered and accounted for this fact.  At his deposition, Hansen testified that resurfacing does *not* necessarily conclusively remedy track defects and that, if resurfacing

is not properly performed, the remedy "will only last for a very short period of time." Hansen testified that, based on his knowledge and experience, "if you surface a track and then . . . [find] defects in that same area two days later, you did not effectively surface that track." Indeed, although resurfacing occurred at the CP Diamond location on August 9, 2017, Hansen's expert report observes that a test conducted on August 11, 2017, identified a defect at the CP Diamond location.[7] The record reflects that Hansen did not *ignore* relevant facts, but instead construed the relevant facts differently than BNSF. This dispute implicates the weight and credibility of Hansen's testimony, not its admissibility.

In summary, BNSF's motion to exclude the opinions and testimony of Carlson's expert witness, Brian Hansen, is denied because each of BNSF's arguments implicates the weight and credibility of Hansen's testimony as opposed to the admissibility of his testimony.

### III.   BNSF's Motion to Bifurcate

Finally, BNSF moves to bifurcate Count I of the complaint from Count II and Count III of the complaint for the purpose of trial. Because the Court grants BNSF's motion for summary judgment as to Count I, as addressed in Part I.A. of this Order, BNSF's motion to bifurcate is denied as moot.

---

[7]   BNSF contends that the defect identified on August 11, 2017, was found on "main track 2" whereas Carlson rode on "main track 1" on that date. But Hansen's testimony suggests that defects found on one track can be indicative of the quality of maintenance performed on an adjacent track.

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.     Defendant BNSF Railway Company's motion for summary judgment, (Dkt. 151), is **GRANTED IN PART AND DENIED IN PART** as addressed herein.

2.     Defendant BNSF Railway Company's motion to exclude expert testimony, (Dkt. 145), is **DENIED**.

3.     Defendant BNSF Railway Company's motion to bifurcate, (Dkt. 134), is **DENIED AS MOOT**.


Dated:  January 4, 2022                                    s/Wilhelmina M. Wright___
                                                           Wilhelmina M. Wright
                                                           United States District Judge